UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| BRANDY HAMILTON, *et al*, | § |
| | § |
| Plaintiffs, | § |
| VS. | § CIVIL ACTION NO. 3:13-CV-240 |
| | § |
| NATHANIEL TURNER, *et al*, | § |
| | § |
| Defendants. | § |

## MEMORANDUM AND ORDER

Plaintiffs Brandy Hamilton and Alexandria Randle allege their Fourth Amendment rights were violated during a traffic stop when they were subjected to body cavity searches on the side of a highway. A Texas Department of Public Safety (DPS) trooper initiated the traffic stop and a female DPS trooper who later arrived at the scene conducted the cavity searches. Because the DPS troopers were dismissed from this lawsuit after a settlement, the remaining claims focus on the role of Aaron Kindred, a deputy with the Brazoria County Sheriff's Department, who arrived to assist with the traffic stop and was present when the searches occurred. In addition to suing Kindred, Plaintiffs assert section 1983 claims against Brazoria County and its Sheriff, Charles Wagner, contending that Kindred's involvement in the searches was consistent with a county policy or practice relating to body cavity searches. Defendants' Motion to Dismiss turns on issues common in section 1983 cases: whether the Plaintiffs have alleged a policy

or practice sufficient to state a claim against the County and its policymaker, and whether the allegations survive the qualified immunity that Deputy Kindred enjoys as a law enforcement officer.

I.   **BACKGROUND**[1]

On the evening of May 28, 2012, Hamilton and Randle were driving north on Highway 288 from Surfside Beach when they were pulled over for speeding by DPS Trooper Nathaniel Turner. The entire traffic stop is recorded on Turner's dash-camera. After asking for their identification, Turner instructed Hamilton, the driver, to get out of the vehicle. When Hamilton requested to first put on a dress over her two-piece bathing suit, Turner responded "don't worry about that, come on out here." Docket Entry No. 19 ¶ 16. Standing "very close to her," Turner asked Hamilton a series of questions about whether she had any drugs on her or in the car, and Hamilton denied having anything. *Id.* ¶ 17. Turner instructed Randle to also get out of the vehicle and asked her similar questions, all of which she denied.

Turner then handcuffed Plaintiffs and called dispatch to "see if a lady is in the area that can come and check these two while I search the vehicle because there is an odor of marijuana" and to request local law enforcement to "stand by and watch the ladies as [he] searched the vehicle." *Id.* ¶¶ 22, 23. He also told dispatch

---

[1] The background section is based on allegations in Plaintiffs' First Amended Complaint, *see* Docket Entry No. 19, which the Court must assume to be true at this stage.

that Randle's zipper was undone on her "'daisy duke' shorts or whatever they are called."  *Id.* ¶ 24.  After placing Hamilton in his patrol car and instructing Randle to "stand and don't move" beside the vehicle, Turner began searching the Plaintiffs' vehicle.  *Id.* ¶¶ 27–31.  Plaintiffs' friends and family arrived at the scene while Turner was searching the vehicle and he told them to go back to their cars.

At this point, Deputy Aaron Kindred of Brazoria County Sheriff's Office arrived in response to Turner's request for assistance.  Turner told Kindred he was "waiting on [the female DPS Trooper] to respond to search these two females" and asked Kindred to get identification from the family and friends who "tried to roll up on [him]."  *Id.* ¶ 35.  After determining that the family and friends "were all clear," Kindred returned and assisted Turner with the vehicle search.  *Id.* ¶ 38.  During the search, Turner asked Randle if she "put that sweet under the front seat."  *Id.* ¶ 36.  Turner and Kindred discussed that there were probably more drugs,[2] but that "she had time to throw it down."  *Id.* ¶ 38.

DPS Trooper Amanda Bui arrived at the scene just after Turner and Kindred finished searching the vehicle and was briefed on the situation.  She said, "do you have any gloves . . . I don't have any gloves" and one of the male officers

---

[2] The Amended Complaint does not specifically mention what, if anything, was found during the vehicle search, but comments like this imply some contraband was found.  Because discovery of any contraband during the vehicle search would have made a roadside cavity search even more unreasonable—the earlier discovery of contraband would have created probable cause to arrest Plaintiffs and transport them away from the scene—the uncertainty concerning this question does not affect the Court's ruling.

3 / 18

responded, "no, I don't have any gloves but you can use these." *Id.* ¶ 42. Kindred asked Bui, "do you want us to make this easier and we get in the back?" *Id.* Turner then told Hamilton, "she [Bui] is going to search you, I ain't, because I ain't about to get up-close and personal with your woman areas." *Id.*

Without asking for consent, Bui performed a body cavity search of Hamilton's vagina and anus while she was handcuffed in the passenger seat of Turner's patrol car. Turner and Kindred both had "a clear view" into the car during the search, as they "can be seen on camera." *Id.* ¶¶ 44, 68. Hamilton "can be seen wincing" and heard on video saying, "do you know how violated I feel?" *Id.* ¶¶ 43, 44. After Bui found nothing from searching Hamilton, Turner told her that Randle's "zipper is open" and "she had time and could have shoved it in her crotch." *Id.* ¶ 44. Bui then performed a similar body cavity search of Randle without changing her gloves from the first search. *Id.* ¶¶ 45, 68. During the search, Randle can be heard "yelling in agony . . . crying and asking Defendant Bui not to do this to her." *Id.* ¶ 48. Neither Plaintiff received a pat-down or frisk prior to the cavity search. *Id.* ¶ 50. Turner ultimately told Hamilton he would issue a ticket for drug paraphernalia and warned her, "[d]on't smoke weed in your car and you won't have to go through this." *Id.* ¶¶ 47, 50.

Plaintiffs filed this case alleging that they suffered "emotional distress and mental anguish and trauma" as a result of being "forcibly searched in their vaginas

and anus[es] against protest," and seeking compensatory and exemplary damages and attorney's fees.  *Id.* ¶¶ 81, 96–99.

Sheriff Wagner and DPS Director Steven McGraw were not present at the traffic stop, but Plaintiffs allege that the officers at the scene "were acting under the direction, control, and supervision" of Wagner and McGraw.  *Id.* ¶ 55.  Moreover, they assert that Brazoria County "failed to train [its] Officers as to the proper procedure regarding searches and seizures" and that the "County's inaction against the cavity searches and unreasonable searches and seizures of their Officers have caused cavity searches to become widespread unofficial policy within Brazoria County."  *Id.* ¶¶ 93, 94.

Plaintiffs voluntarily dismissed McGraw from the case before he was served, Docket Entry No. 6, and subsequently dismissed DPS Troopers Turner and Bui pursuant to a settlement agreement, Docket Entry No. 30.  The remaining Defendants—Deputy Kindred, Sheriff Wagner, and Brazoria County—moved to dismiss all claims against them.  Docket Entry No. 9.  The Court allowed Plaintiffs to replead their Fourth Amendment claims rather than ruling on Defendants' first motion to dismiss.  After Plaintiffs filed an amended complaint, Docket Entry No. 19, Defendants once again moved to dismiss, Docket Entry No. 20.  In their renewed motion to dismiss, Defendants argue that Plaintiffs have failed to adequately plead their claims and assert qualified immunity defenses.

## II. RULE 12 STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion, the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). The court does not look beyond the face of the pleadings to determine whether the plaintiff has stated a claim. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To survive a motion to dismiss, a claim for relief must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III. CLAIMS AGAINST DEPUTY KINDRED

Plaintiffs bring claims against Kindred under section 1983 for violations of their Fourth Amendment rights because he "watched and did not stop a cavity search that he knew or had reason to know was unconstitutional." Docket Entry No. 19 ¶ 72. Kindred moves to dismiss the claims against him, asserting that Plaintiffs have not pled sufficient facts to show he participated in the alleged unlawful searches and alternatively, that he is entitled to qualified immunity.

### a. Bystander Liability

An officer who does not directly conduct an unlawful search, but is present at the scene when such a search takes place, may be liable under the doctrine of "bystander liability." That liability attaches when "the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002)). "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Id.* at 647 (quoting *Randall*, 302 F.3d at 204 n.24).

Under the first element, the Court must determine whether the alleged cavity search would violate Plaintiffs' constitutional rights, and if so, whether Kindred knew the search was occurring. *Martin v. City of San Antonio* analyzed the constitutionality of a "highly intrusive" roadside cavity search for drugs much like the one alleged here. In *Martin*, officers "taunted Plaintiff about the impending search," and the search "was conducted on a public street rather than at a medical facility" and "in public view of male officers and passing vehicles." 2006 WL 2062283, at *5 (W.D. Tex. July 25, 2006). After conducting a lengthy review of the law related to the constitutionality of body cavity searches, *see id.* at *5–8, the

court explained that "it was well settled by January 15, 2003, that strip searches and body cavity searches raise serious Fourth Amendment concerns." *Id.* at *6 (citing *Roe v. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 409 (5th Cir. 2002). In particular, "[t]he Fifth Circuit has noted that few searches are more intrusive than a body cavity search, *United States v. Caldwell,* 750 F.2d 341, 343 n.2 (5th Cir. 1984), and '[t]he more intrusive the search, the heavier is the government's burden of proving its reasonableness.' *United States v. York*, 578 F.2d 1036, 1041 (5th Cir. 1978)." *Id.*; *see Bell v. Wolfish*, 441 U.S. 520, 558–59 (1979) (explaining that the Fourth Amendment prohibits unreasonable searches, which requires a balancing of the need for a particular search against the invasion of personal rights that the search entails); *see also Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir.1983) (noting that strip searches and body cavity searches are "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, [and] signifying degradation and submission" (citation omitted)).

In balancing the need for the particular search with the "severe" personal intrusion in *Martin*, the Court concluded that "[e]ven if the officers reasonably suspected that Plaintiff was concealing contraband in a body cavity, there were no exigent circumstances requiring the search to be conducted on a public roadside rather than at a medical facility." *Martin*, 2006 WL 2062283, at *5. Therefore, the

*Martin* court held that "the alleged manner of the search would have violated Plaintiff's Fourth Amendment rights and that no reasonable officer would have believed the manner of the search to be reasonable." *Id.*

If, as *Martin* thoroughly demonstrates, the unlawfulness of roadside body cavity searches barring exigent circumstances was clearly established under Fifth Circuit law in 2003, then the same is true nine years later for an alleged body cavity search of a female's vagina and anus conducted on the side of a public highway in view of male officers under unsanitary conditions.[3] Even if the officers here reasonably suspected that Plaintiffs were concealing drugs in a body cavity, no exigent circumstances existed in this case that required the "search to be conducted on a public roadside rather than at a medical facility." *Martin*, 2006 WL 2062283, at *5. Thus, no reasonable police officer could believe such a search to be lawful.

---

[3] Because, as *Martin* explained, Fifth Circuit law is clearly established, the Court need not analyze whether consensus exists outside the circuit. However, that consensus does exist. *See, e.g.*, *Lucero v. Bush*, 737 F. Supp. 2d 992, 1010 (D.S.D. 2010) (quoting *Evans v. Stephens,* 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc)) (denying summary judgment based on qualified immunity for an officer who allegedly performed a digital body cavity search of a plaintiff in a porta potty using the same pair of gloves that the officer had already used to perform a pat-down search of the plaintiff because the "Fourth Amendment itself provided, at the time, sufficient notice that the manner of these particular searches [were] 'unreasonable' in the constitutional sense"); *Foster v. City of Oakland*, 621 F. Supp. 2d 779, 791 (N.D. Cal. 2008) (concluding that under the Fourth Amendment, physical body cavity searches performed in the field require "exigent circumstances," "a warrant authorizing the search," and they must be "administered by an authorized medical professional"); *see also Spencer v. Roche*, 755 F. Supp. 2d 250, 260–61 (D. Mass. 2010) *aff'd*, 659 F.3d 142 (1st Cir. 2011) (finding that as a matter of law, a digital cavity search for drugs which was performed pursuant to a warrant and "by a physician at a hospital in a manner that appears to have been medically appropriate" was lawful).

Accordingly, if Kindred knew a cavity search was happening, then he knew or should have known that a fellow officer was violating Plaintiffs' constitutional rights. Plaintiffs have alleged enough facts—which are assumed to be true at this stage—to demonstrate that Kindred knew a body cavity search was happening. First, they allege that not only was Kindred present for the discussion with Turner and Bui about finding gloves for the cavity search and for Turner's taunting comments to Plaintiffs about the search, but that Kindred himself asked Bui "do you want us to make this easier and we get in the back?"[4] Docket Entry No. 19 ¶¶ 42, 44. In addition, they allege Kindred had a view of the vehicle where the cavity search was performed, and that Plaintiffs' complaints were loud enough to be heard by the officers standing by, but that Kindred did not intervene to stop the search. *Id.* ¶ 72.

The Complaint also satisfies the second and third elements of bystander liability. The alleged facts support a finding that Kindred had a reasonable opportunity to prevent the unreasonable cavity search—either while discussions about the search and preparations were happening or while the search was actually happening and he was standing watch—but that he chose not to act. *Id.* ¶¶ 42–45, 48, 68. *See Estep v. Dallas Cnty., Tex.*, 310 F.3d 353, 361 (5th Cir. 2002)

---

[4] The Court notes that these facts, assumed to be true, may even be sufficient at this stage to find Kindred liable as not just a bystander, but a participant in the search. However, since the Court concludes that Plaintiffs' claims against Kindred under a theory of bystander liability survive the Motion to Dismiss, it need not address this alternative theory.

(concluding that an officer who was not personally involved in the unconstitutional search of a vehicle but who "knew the search was transpiring . . . decided to allow the search to go forward" by not stopping it).

### b. Qualified Immunity

Qualified immunity ordinarily requires an additional level of inquiry beyond the question whether a constitutional violation is alleged: even if that violation is alleged, qualified immunity shields a public official from litigation and liability unless the violation was "clearly established" when it occurred. *Whitley*, 726 F.3d at 654–55 (quoting *Ashcroft v. al–Kidd*, --- U.S. ----, 131 S.Ct. 2074, 2080 (2011)) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."). In a bystander liability case like this one, however, the "clearly established" qualified immunity standard is largely subsumed in the preliminary question whether a constitutional violation is alleged. *Compare Whitley*, 726 F.3d at 646 (5th Cir. 2013) (explaining that a bystander officer is liable only when he "knows that a fellow officer is violating an individual's constitutional rights" (citation omitted)), *with id.* at 654 (stating that to overcome qualified immunity the alleged right must be "clearly established at the time of the challenged conduct" (citation omitted)). The discussion above showing that the

law concerning roadside body cavity searches was sufficiently established to subject Kindred to bystander liability thus also defeats the qualified immunity defense at this stage of the case. *See Martin*, 2006 WL 2062283, at *5–6 (concluding that the officers present at the search were not entitled to qualified immunity because "the law [in the Fifth Circuit] was sufficiently clear by January 15, 2003 that no reasonable officer would have believed the manner of the search to be reasonable at that time"); *see also Estep*, 310 F.3d at 361 (holding that an officer who was not personally involved in the unconstitutional search of a vehicle, but who clearly knew the search was transpiring and "was the officer on the scene who had the information from which to determine whether [plaintiff] truly posed a danger," was not entitled to summary judgment on qualified immunity).

## IV.   CLAIMS AGAINST BRAZORIA COUNTY AND SHERIFF WAGNER

Although the fact that Kindred did not instigate or conduct the search does not relieve him of liability given his presence and involvement at the scene, it does make it more difficult for Plaintiffs to establish that the search was part of a policy or practice of Brazoria County—as opposed to DPS—when their allegations seem to require that an inference of a practice be drawn from this one incident.

### a.  Policy or Practice of "Widespread Cavity Searches"

Under section 1983, a public entity is not "vicariously liable for the constitutional torts of its employees or agents." *Thomas v. City of Galveston, Tex.*,

800 F. Supp. 2d 826, 840–41 (S.D. Tex. 2011). A local government entity may be sued, however, "if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citations and internal quotation marks omitted). Establishing section 1983 liability for a county thus requires the following three showings: "[1] a policymaker; [2] an official policy; and [3] a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citation omitted). Municipalities may be liable "where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." *Zarnow*, 614 F.3d at 166 (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). "[I]t is nearly impossible to impute lax disciplinary policy to [a municipal government] without showing a pattern of abuses that transcends the error made in a single case." *Piotrowski*, 237 F.3d at 582.

Though Plaintiffs generally contend that "cavity searches [have] become widespread unofficial policy within Brazoria County," Docket Entry No. 19 ¶¶ 93, 94, they fail to allege any specific facts to support this claim, such as a single prior roadside body cavity search involving the Sheriff's Department. *See id.* ¶ 59 (asserting without giving any specific examples that Defendants "had actual notice

of previous problems and complaints concerning long standing pattern of police misconduct involving unlawful strip searches, cavity searches, and other acts such as this"). This dearth of prior, similar incidents almost invariably results in dismissal. *Compare Allen v. Burnett*, 2013 WL 2151218, at *3–4 (N.D. Tex. May 17, 2013) (dismissing a municipal liability claim when the plaintiff only alleged one improper police action—which was committed against him—in arguing that the police department had adopted an unconstitutional policy or custom), *and Davenport v. City of Garland, Tex.*, 2010 WL 1779620, at *2–3 (N.D. Tex. Apr. 9, 2010), *accepted by* 2010 WL 1779619 (N.D. Tex. Apr. 30, 2010) (dismissing a municipal liability claim because conclusory allegations such as "the use of excessive force . . . is so common and well known . . . that it constitutes a custom that fairly represents official policy" were "unsupported by facts, [and] are not entitled to the presumption of truth"), *with Oporto v. City of El Paso*, 2010 WL 3503457, at *5–6 (W.D. Tex. Sept. 2, 2010) (denying a motion to dismiss a policy of excessive force claim when the plaintiff alleged thirty-two prior incidents of excessive deadly force), *and Barr v. City of San Antonio*, 2006 WL 2322861, at *4 (W.D. Tex. July 25, 2006) (denying a motion to dismiss a policy of excessive force claim where the plaintiff alleged four similar lawsuits naming the defendant, even though the plaintiff did not provide the court with a list of those cases).

Without any specific allegations about even one prior incident, all Plaintiffs have against the County is Kindred's presence at this search. In some circumstances, it may be appropriate to draw inferences at the pleadings stage about the existence of a practice based on one incident—allegations that provide fair notice to a defendant "could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, *the involvement of multiple officials in the misconduct*, or the specific topic of the challenged policy or training inadequacy." *Thomas*, 800 F. Supp. 2d at 843–44 (emphasis added). But Kindred's role as a bystander prevents reliance on these situations. No other Sheriff Department employee was present, meaning there were not multiple deputies acquiescing in the conduct which might allow an inference that the department routinely engages in roadside body cavity searches. And because the search was not even Kindred's idea, it makes it more difficult to conclude that the search flowed from a Sheriff's Department policy or custom without any specific incident other than this one being alleged. *Cf. Twombly*, 550 U.S. at 557 ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a [conspiracy] claim . . . without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." (internal alterations, quotation marks, and citations

omitted)). Without even "minimal factual allegations" identifying a Brazoria County policy or widespread custom that caused the alleged unconstitutional search, the Court will dismiss Plaintiffs' section 1983 claims against the County and Wagner that are based on allegations of a policy or practice of body cavity searches. *See Thomas*, 800 F. Supp. 2d at 842–45 (discussing the proper pleading standard for municipal liability claims and determining that although "Plaintiff's allegations are fairly lengthy, they consist only of a list of number of broadly-defined constitutional violations . . . followed by the assertion that there was a pattern of such violations").

### b. Failure to Train or Supervise

A county's failure to train or supervise "employees may also constitute a policy, but only when it reflects a deliberate or conscious choice by a [county]." *Id.* at 841 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (internal quotation marks omitted)). To succeed on that claim, Plaintiffs must show (1) that the County had inadequate training procedures; (2) that inadequate training caused the officers to injure them; and (3) that the municipal policymakers were deliberately indifferent when they adopted the training policy. *Pineda v. City of Houston*, 291 F.3d 325, 331–32 (5th Cir. 2002). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Porter v. Epps*, 659 F.3d 440, 446–

47 (5th Cir. 2011) (Owen, J., concurring) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Id.* at 447 (majority opinion) (citations and internal quotation marks omitted).

Plaintiffs' failure-to-train allegations fail for the same reasons their general allegations of policy do. The Complaint restates the basic elements of a failure-to-train claim without providing any factual allegations of prior problems with unreasonable cavity searches that would give the County a reason to think its training was deficient. Plaintiffs' allegation is that the County failed to adequately train its officers about probable cause, informed consent, and cavity searches. Docket Entry No. 19 ¶ 60. "[W]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Epps*, 659 F.3d at 447 (citations and internal quotation marks omitted); *see also Valle*, 613 F.3d at 548 (finding no deliberate indifference in failure-to-train claim where the plaintiff did not allege any prior specific instances of excessive force or official awareness of prior excessive force); *Frahm v. Refugio Cnty., Tex.*, 2012 WL 1805329, at *5 (S.D. Tex. May 16, 2012) (dismissing a failure-to-train claim for failing "to identify a single individual in the County's custody beside Frahm who was allegedly denied proper medical treatment by an untrained employee").

17 / 18

Standing alone, without any specific allegations of similar violations by other untrained corrections officers, Plaintiffs' failure-to-train allegations are insufficient.

V.  **CONCLUSION**

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Docket Entry No. 20). The claims against Brazoria County and Sheriff Wagner are **DISMISSED**, but the claims against Deputy Kindred remain.

**SIGNED** this 16th day of April, 2014.

_____
Gregg Costa
United States District Judge